AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

# SEALED

for the

Eastern District of Louisiana

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.  19-MC-13696 |
| 3443 Esplanade Avenue, Apartment #147, New Orleans, Louisiana | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Louisiana _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan Schumacher, Special Agent, DEA
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___11/18/2019___

_____
*Judge's signature*

City and state: New Orleans, Louisiana

Hon. Janis van Meerveld, U.S. Magistrate Judge
_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

# SEALED

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH | * | MISC. NO.  19-MC-13696 |
| OF THE PREMISES KNOWN AS 3443 | | |
| ESPLANADE AVENUE, | * | |
| APARTMENT #147, | | |
| NEW ORLEANS, LOUISIANA | * | |

*       *       *

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Schumacher, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigation of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since March 2016.  My formal education includes a Bachelor of Arts in Quantitative Economics from Providence College, Rhode Island.  In March 2016, I attended the DEA Basic Agent Training Academy.  During the course of my formalized training at the DEA Basic Agent Training Academy, I learned the fundamentals of how to conduct criminal investigations.

2.      I am currently assigned to the DEA New Orleans Field Division ("NOFD"), where I am a member of a multi-agency task force. I have participated in investigations of illegal narcotics trafficking and racketeering offenses and I am thoroughly familiar with the investigative techniques used in these investigations.  While I have been a member of the DEA, I have been the affiant on over five wiretapping applications for the interception of wire and electronic communications.  I have participated in over 10 wiretapping investigations, and have personally listened or read hundreds of intercepted telephone communications.  Prior to my assignment at DEA, I was an analyst with TD Bank in New York, New York.  The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      I make this affidavit in support of a search warrant to search the premises described in Attachment A, namely, 3443 Esplanade Avenue, Apartment #147, New Orleans, Louisiana (the "Target Residence"), for the items described in Attachment B.

4.      Based upon my training and experience and the facts set forth in this affidavit, I believe there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 946 are being and have been committed by Sean ESPRIT ("ESPRIT") and Sean MARTIN ("MARTIN") and others known and unknown.  There is also probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

*Background*

5.      DEA and the Federal Bureau of Investigation ("FBI") have been conducting this investigation for several months.  The investigative techniques utilized during this investigation have included court authorized wiretapping orders, physical surveillance, pole cameras, administrative subpoenas, and other sources.

6.      The investigation has revealed that Sean MARTIN is a narcotics trafficker based in the New Orleans metropolitan area.  ESPRIT is MARTIN's son, who also works with MARTIN to sell narcotics, primarily heroin, in New Orleans.  MARTIN and ESPRIT utilize ESPRIT's apartment, the Target Residence, to store narcotics and likely narcotics proceeds and paraphernalia.  Although ESPRIT lives at the Target Residence, the investigation has revealed that MARTIN has free access to the Target Residence.  In addition, MARTIN meets with various customers in the New Orleans metropolitan area to whom he provides heroin that he stores at the Target Residence.  In addition, the investigation has revealed that one of MARTIN's associates, Kevin PRICE ("PRICE"), receives cocaine from a source of supply, Larry LABRY ("LABRY"), and the investigation has revealed that PRICE has attempted to set up a cocaine transaction between LABRY and MARTIN.   Finally, the investigation has revealed that William ROBERTSON ("ROBERTSON") acts as a facilitator for the organization, and that the organization utilizes ROBERTSON's residence, located at 1330 Kerlerec St., New Orleans, Louisiana ("1330 Kerelec. St." or "ROBERTSON's Residence"), in furtherance of their drug trafficking activities.

7.      As described above, this investigation has utilized court-ordered wiretapping orders.  For instance, on October 23, 2019, the Honorable Sarah S. Vance, United States District

Judge, Eastern District of Louisiana, issued an order under miscellaneous number 19-MC-12245, authorizing the interception of wire and electronic communications of a telephone assigned number (504) 201-6450 ("MARTIN's Phone"),[1] utilized by MARTIN.  Interceptions pursuant to that order began on October 23, 2019, and are currently ongoing.  Pursuant to that order, my team has intercepted conversations between MARTIN and ESPRIT, who utilizes telephone number (504) 657-4974 ("ESPRIT's Phone").[2]

8.      In addition, on September 11, 2019, the Honorable Sarah S. Vance, United States District Judge, Eastern District of Louisiana, issued an order under miscellaneous number 19-MC-12245 authorizing the interception of wire and electronic communications of a telephone assigned number (504) 228-8646 ("PRICE Telephone #1') and (504) 209-0051 ("PRICE Telephone #2").  Interception over PRICE Telephone #1 and PRICE Telephone #2 began on September 11, 2019.  Interceptions over PRICE Telephone #2 terminated on September 23, 2019.  Interceptions over PRICE Telephone #1 terminated on October 10, 2019.  The user of PRICE Telephone #1 and PRICE Telephone #2 is PRICE ("PRICE"), one of MARTIN's associates.

*ESPRIT Resides at the Target Residence*

9.      The Target Residence is located within a residential apartment complex called "The Esplanade at City Park."  That complex is an apartment building, and the Target Residence is located on the first floor of the building.  The number "147" is marked to the left of the door of the apartment.

---

[1] MARTIN's Phone is subscribed to "Angela Lyons, 12530 Carmel Pl., New Orleans, Louisiana" and has been since December 3, 2013.  Queries of commercial databases, including Thomson Reuters CLEAR, indicate that MARTIN's Phone was listed in a credit application made in MARTIN's name.  In addition, the database revealed that MARTIN and Lyons reside together at 12530 Carmel Pl., New Orleans, Louisiana.  In addition, my team has observed MARTIN utilizing MARTIN's Phone while phone records indicated it was being used.  Finally, my team has intercepted the outgoing voicemail message of MARTIN's Phone, which states that the user is named "Sean."

[2] ESPRIT's Phone is subscribed to "Sean ESPRIT."  In addition, intercepted telephone calls over MARTIN's Phone have revealed that ESPRIT utilizes ESPRIT's Phone, as described later in this affidavit.

10.     On November 12, 2019 and November 15, 2019, administrative subpoenas were issued to the management of The Esplanade at City Park for rent roll information and video surveillance footage from the apartment complex.  Records provided to DEA revealed that the renter of the Target Residence is ESPRIT.  In addition, surveillance footage showing the front door to the Target Residence revealed that ESPRIT regularly entered and exited the Target Residence.

*September 12-13, 2019 Transaction Involving LABRY, PRICE and MARTIN*

11.     Based on intercepted telephone calls, in conjunction with surveillance conducted via a pole camera, I believe that PRICE received a quantity of narcotics from LABRY on or about September 12, 2019.  In addition, I believe that PRICE acted as a middleman between LABRY and MARTIN, which ultimately resulted in MARTIN receiving a quantity of narcotics that originated from LABRY.  I also believe that ROBERTSON acted as a facilitator for this transaction, relaying messages between PRICE, MARTIN, and other of their associates.

12.     On September 12, 2019, at approximately 9:48 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing (504) 416-0006 ("LABRY's Phone") and said, "I see you." LABRY replied, "I didn't know you was in there, I thought you was gone." Geolocation information during this call indicated that PRICE was in the vicinity of Press Drive and Louisa St., New Orleans, LA.

13.     Based on this investigation, I believe that there exists a familial relationship between PRICE and LABRY. Moreover, an individual they commonly refer to as "mom" resides in close proximity to the aforementioned cell site information. As such, I believe that when PRICE said, "I see you," he had observed LABRY at the address of "mom" and that they then conducted a face to face meeting.  As described below, based on subsequent intercepted telephone calls, I believe that PRICE received a quantity of narcotics, likely cocaine, from LABRY at that time.

5

14.     Later that day, at approximately 10:01 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, utilizing (504) 202-5098 ("ROBERTSON's Phone"). During this call PRICE said, "You talk to 'Young' yet?" and ROBERTSON replied that he had not.  PRICE then said, "You need to hit 'Young,' I just holler'd at Larry."  ROBERTSON said, "Oh yea?" to which PRICE replied, "Yea, I'll see you in a few minutes, I'm on my way to you now." Geolocation information during this call indicated PRICE was at his residence, located at 5130 Baccich St., New Orleans, Louisiana ("PRICE's Residence") during this conversation.

15.     I know, based on my training and experience, that narcotics traffickers often use the phrase, "holler'd at" to denote meeting with another party to conduct narcotics related business. I believe that when PRICE said "I just holler'd at Larry," he indicated to ROBERTSON that he had just met with LABRY and obtained a quantity of narcotics.   Further, based on this investigation, I know that PRICE stores bulk narcotics at PRICE's Residence and maintains only a working inventory of narcotics when at ROBERTSON's Residence. Therefore, the fact that PRICE returned to PRICE's Residence briefly before traveling to meet ROBERTSON corroborates my belief that PRICE obtained a resupply of narcotics from LABRY.

16.     Based on pen register records, at approximately 10:02 A.M., ROBERTSON placed an outgoing call to MARTIN's Phone, utilized by MARTIN, which lasted approximately 42 seconds.  This was the first outgoing telephone call placed by ROBERTSON after the above-described conversation with PRICE. Given the immediacy with which ROBERTSON placed an outgoing call to MARTIN after speaking to PRICE, I believe that "Young" is a nickname PRICE and ROBERTSON use for MARTIN. Given the urgency of PRICE when he asked whether ROBERTON had spoken to "Young" and the context given when he reiterated, "You need to hit 'Young," I believe that MARTIN was a party to the narcotics transaction which had just taken

place between PRICE and LABRY. Specifically, I believe that during this telephone call at 10:02 A.M., ROBERTSON relayed the information that he received from PRICE during the 10:01 A.M. telephone call, described above, and asked MARTIN whether MARTIN had money necessary to purchase a quantity of narcotics from LABRY.

17.     On that same morning, my team conducted surveillance of ROBERTSON's Residence, via a pole camera. Later that day, at approximately 10:06 A.M., ROBERTSON arrived at ROBERTSON's Residence in his Ford pickup truck, at which time PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, utilizing ROBERTSON's Phone, who said, "As we speak." PRICE replied, "I'm on my way to ya." This was the first outgoing telephone call placed by ROBERTSON's Phone after the above-described 10:02 A.M. telephone call to MARTIN's Phone.

18.     Immediately after ending his call with ROBERTSON, PRICE, utilizing PRICE Telephone #1, placed an outgoing call to LABRY, utilizing LABRY's Phone, who said, "Yea big man." PRICE replied, "Yea he just called, I'm about to go meet him and come by you," and LABRY responded, "Alright, I'ma be out there."

19.     I believe that when ROBERTSON said, "as we speak," he was relaying to PRICE that he had just spoken to MARTIN (referring to the 10:02 A.M. telephone call described above) and that MARTIN had told ROBERTSON that he was on his way to meet ROBERTSON and PRICE. I then, in turn, believe that when PRICE told LABRY, "Yea he just called, I'm about to go meet him and come by you," PRICE informed LABRY that he had just spoken to ROBERTON and by extension, MARTIN, and that he would meet with them with regards to an ongoing narcotics transaction involving all of the aforementioned parties.

20.     Shortly after the end of PRICE and ROBERTSON's phone call, at approximately 10:08 A.M., utilizing the pole camera I conducted surveillance of ROBERTSON's Residence. A Toyota sedan, Louisiana license plate 242AKJ (the "Toyota"), arrived at ROBERTSON's Residence at which time MARTIN exited the Toyota's rear passenger door. ROBERTSON and MARTIN conversed outside of ROBERTSON's Residence until PRICE arrived several minutes later in his Infiniti, at approximately 10:12 A.M.  Subsequently, I observed MARTIN to be utilizing a cellular telephone.  Telephone records for MARTIN's Phone indicated that MARTIN's Phone was active at that time, and therefore, I believe that MARTIN was the user of MARTIN's Phone.

21.     Subsequently, PRICE, MARTIN and ROBERTSON conversed for several minutes outside of ROBERTSON's Residence before MARTIN got into the rear of the vehicle he arrived in, which then departed.

22.     At approximately 11:12 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone.  PRICE stated, "I was waiting on him, I came and talked to him. He told me he about to go handle it. He told me to stay in the area, he was gonna call me in a few." LABRY replied, "cool, just call me (U/I)." At approximately 11:31 A.M., pen register data showed a text message sent from ROBERTSON's Phone to MARTIN's Phone. Pole camera surveillance showed that during this time, ROBERTSON and PRICE were together in front of ROBERTSON's Residence.  At approximately 11:36 A.M., ROBERTSON's Phone received an incoming text message from MARTIN's Phone.  Subsequently, at approximately 11:39 A.M., ROBERTSON's Phone sent an outgoing text message to MARTIN's Phone. Subsequently, at approximately 11:39 A.M. ROBERTSON's Phone received an incoming text message from MARTIN's Phone.

23.     During the aforementioned call, I believe that when PRICE said, "I was waiting on him, I came and talked to him," he had informed LABRY that he had just met with MARTIN. Moreover, the visual surveillance of the aforementioned meeting between PRICE, MARTIN and ROBERTSON further confirmed my belief that the "him" referred to in this telephone call was MARTIN.  Further, I believe that when PRICE stated, "He told me he about to go handle it. He told me to stay in the area, he was gonna call me in a few," he was explaining to LABRY that MARTIN had told him that he was in the process of collecting proceeds for a quantity of narcotics he had negotiated, through PRICE, to purchase form LABRY.  In addition, I believe that PRICE was informing LABRY that MARTIN would obtain said funds shortly, at which time PRICE would deliver them to LABRY.  Based on my training and experience, I know that it is common for narcotics supplies to arrange for trusted associates to utilize their "plug" or supplier, but only indirectly, as not to exclude themselves from leveling a "tax" on any transaction. "Taxing" a transaction refers to a narcotics trafficker taking a fee on a transaction they are party to, namely on one that their main role is connecting buyer and seller.  Based on this investigation and others conducted by members of DEA New Orleans, I know that both LABRY and MARTIN are kilogram level cocaine and heroin distributors, a capacity that exceeds that of PRICE. Despite this, given PRICE's existing relationship with LABRY and his close association with MARTIN through ROBERTSON's Residence, PRICE is ideally positioned to profit from a recurring narcotics relationship between LABRY and MARTIN, with PRICE set to levy a "tax" on these dealings.

24.     PRICE and ROBERTSON continued to congregate near the stoop of the Residence and at approximately 11:31 A.M., ROBERTSON was observed utilizing his telephone.   As

described above, pen registers active on ROBERTSON's Phone indicated that ROBERTSON and MARTIN, utilizing MARTIN's Phone, exchanged four SMS messages over the next nine minutes.

25.     At approximately 1:24 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, which went unanswered.

26.     Based upon this pattern of communications, I believe that after PRICE spoke with LABRY, ROBERTSON contacted MARTIN on MARTIN's Phone (during the above-described text message exchanges) in an effort to ascertain if he had acquired the proceeds PRICE was waiting to bring to LABRY.  As a result of what MARTIN told ROBERTSON, I believe that PRICE did not answer LABRY's call in an effort to afford MARTIN more time.

27.     At approximately 2:16 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, who said, "What it do, big man." PRICE replied, "Shit, i'm still waiting," and LABRY said, "Shit still down, huh?" PRICE responded, "I can't go nowhere, I have to...I aint got all night either," and went on to say he had to be at the airport early the next morning to pick up a family member. LABRY then said, "I'm waiting on you," and PRICE acknowledged before the call was terminated.

28.     During the aforementioned call, I believe that when PRICE said, "shit, i'm still waiting," and LABRY replied, "shit still down, huh?" they were referring to the fact that MARTIN had yet to provide PRICE with currency that he was to deliver to LABRY.

29.     After the aforementioned phone call, two of MARTIN's associates, Corey JULUKE ("JULUKE") and Ronald WILSON Jr. ("WILSON Jr.") departed ROBERTSON's Residence in WILSON Jr.'s SUV, returning within a half hour.  After some time, WILSON Jr. retrieved a red plastic bag from his SUV, which he then took inside ROBERTSON's Residence. Shortly thereafter, WILSON Jr. departed in his vehicle.  He was not holding the red plastic bag.

30.    At approximately 4:06 P.M., PRICE, ROBERTSON and JULUKE exited ROBERTSON's Residence, at which time ROBERTSON was observed to be carrying the red plastic bag WILSON Jr. had previously brought into ROBERTSON's Residence.  The three then got into PRICE's Infiniti SUV and departed, with ROBERTSON in the driver's seat.

31.    At approximately 4:50 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, and said, "I'm still waiting man," and LABRY said, "That nigga ain't gonna always...shit."  PRICE replied, "He said he was waiting on the police, he had an accident in the rental," and LABRY responded, "alright, I'ma start moving around, I got to go, I cant sit that long" and PRICE replied "I'll fuck with you."

32.    With respect to the aforementioned call, I believe that when PRICE said, "I'm still waiting man," he was informing LABRY that he had yet to meet with MARTIN because MARTIN was involved in a traffic accident.

33.    Approximately a half hour after the aforementioned call, ROBERTSON and PRICE returned to ROBERTSON's Residence, at which time both men exited the vehicle and the aforementioned red plastic bag was not observed.

34.    The investigation has revealed that, WILSON Jr. often acts as a facilitator for JULUKE, as the latter attempts to insulate himself from directly handling narcotics and the proceeds derived from their trafficking.  Further, I know that narcotics traffickers will often utilize a third party to drive a vehicle when they are traveling with illicit substances or proceeds.  As such, I believe that when JULUKE and WILSON Jr. returned to ROBERTSON's Residence, they had just collected narcotics proceeds which were contained in the red plastic bag WILSON Jr. carried in ROBERTSON's Residence.  Further, when JULUKE, PRICE and ROBERTSON departed the Residence, ROBERTSON carried the red plastic bag on behalf of JULUKE and drove PRICE's

vehicle such that JULUKE and PRICE had further deniability should they be stopped by law enforcement in transit to JULUKE's destination.

35.     The next day, on September 13, 2019, at approximately 7:49 A.M., PRICE, utilizing PRICE Telephone #1, placed an outgoing call to ROBERTSON, utilizing ROBERTSON's Phone. During this call, ROBERTSON, discussing his morning plans said, "I'ma try to get home to see with that, see if I get any phone calls." I believe that during this call, when ROBERTSON referred to "phone calls," he was referring to the same calls LABRY and PRICE were waiting on from MARTIN.

36.     A pen register active on a telephone utilized by JULUKE, indicated that at approximately 8:05 A.M., JULUKE received an incoming call from MARTIN, utilizing MARTIN's Phone, which lasted approximately 12 seconds. Additionally, at approximately 8:19 A.M., JULUKE placed an outgoing call to MARTIN's Phone, utilized by MARTIN, which lasted approximately 25 seconds. I believe that during these calls, JULUKE and MARTIN discussed the collection of proceeds owed to LABRY for narcotics.

37.     At approximately 8:38 A.M, ROBERTSON received an incoming call from MARTIN's Phone, utilized by MARTIN, which lasted approximately 29 seconds, followed by an outgoing call to MARTIN's Phone at approximately 8:41 A.M, which lasted approximately 36 seconds. I believe that during these calls, MARTIN provided a status update on the money owed to LABRY to ROBERTSON.

38.     Over the course of one minute, beginning at approximately 9:25 A.M., JULUKE sent two and received one text message from MARTIN's Phone. I believe that these text messages related to the earlier conversations between JULUKE and MARTIN, during which they discussed the collection of proceeds owed to LABRY for narcotics.

39.     On that same morning, my team conducted surveillance of ROBERTSON's Residence, via the aforementioned pole camera. At approximately 9:55 A.M., JULUKE arrived at the Residence in his BMW sedan and spoke to ROBERTSON. Several minutes later, JULUKE returned to his vehicle and departed.

40.     At approximately 10:11 A.M., PRICE, utilizing PRICE Telephone #1, placed an outgoing call to LABRY, utilizing LABRY's Phone, and briefly discussed their common family member, "moms." After a short time, LABRY said, "You man a'int never called you, huh?" and PRICE stated, "Yup, he called me this morning. I told him i'ma wait until they come back, man. Because I'm going to be doing nothing but sitting. Yesterday what happened, he had a rental right, and he had be renting a rental but it was time to go back, so he had let someone take a ticket and hit him, for the insurance, he  was tired of waiting for the police." PRICE continued, "But he called me, he called me about 7:30 this morning and said you can move now? and I told him man it's too late, I'll wait."

41.     I believe that when LABRY said, "you man a'int never called you, huh?" he was referring to MARTIN and inquiring as to whether he had contacted PRICE to let him know he had collected the requisite proceeds. As described above, prior to LABRY and PRICE's call and after ROBERTSON and PRICE's call, I believe JULUKE and MARTIN spoke with regards to collecting proceeds due to LABRY, some of which were contained in the red plastic bag observed on surveillance the day prior. MARTIN then contacted to ROBERTSON to give him a status update. Being that this update occurred after PRICE and ROBERTSON spoke, I believe that PRICE took the liberty of explaining to LABRY that unforeseen circumstances involving MARTIN's rental car had preluded MARTIN from delivering the proceeds LABRY had expected form PRICE the day prior.

13

42.     I know, based on surveillance of ROBERTSON's Residence, that MARTIN, including on September 12, 2019, was driving a red Chevy Equinox, bearing Illinois license plate BF 88633. An administrative subpoena issued to Avis for rental agreement information indicated it was rented by MARTIN and that it was due back on September 12, 2019. I believe that this information, in conjunction with PRICE's conversation with LABRY, corroborates my belief that MARTIN was the individual PRICE and LABRY were ultimately referring to and further, that ROBERTSON was insulating LABRY and PRICE from direct telephonic with MARTIN to thwart law enforcement efforts to uncover their overall illicit operation.

43.     At approximately 10:34 A.M., JULUKE returned to the ROBERTSON's Residence in his BMW sedan and joined ROBERTSON on the stoop, before both entered ROBERTSON's Residence. Shortly thereafter, Robert JOHNSON ("JOHNSON"), another associate, arrived in Land Rover Discover, bearing LA Tag ZYH068, and entered ROBERTSON's Residence. Soon after, a silver GMC SUV, bearing FL Tag GVUK53, arrived at the Residence, at which time MARTIN exited the vehicle with a white plastic bag and a small card board box and entered the Residence. Lastly and within minutes of MARTIN arriving, CHENEAU arrived at ROBERTSON's Residence and went inside.

44.     Within two minutes of MARTIN's arrival, he and JOHNSON emerged from ROBERTSON's Residence, at which time JOHNSON was observed to be carrying a white plastic bag. The two men then walked toward JOHNSON's vehicle, which he then departed in, at which time MARTIN returned to ROBERTSON's Residence. I believe that JOHNSON received a quantity of narcotics or narcotics proceeds from MARTIN at ROBERTSON's Residence, given the duration of their meeting and the pattern of activity my team has observed at ROBERTSON's Residence for several months.

45. At approximately 11:23 A.M., MARTIN exited ROBERTSON's Residence empty handed and departed in his vehicle. JULUKE also left the area several minutes later.

46. Later that day, on September 13, 2019, at approximately 3:03 P.M., PRICE, utilizing PRICE Telephone #2, placed an outgoing call to a telephone assigned number (504) 610-0353, utilized by an unidentified male who goes by the name "Terry" ("Terry LNU"). During this call, PRICE and Terry LNU did not initially recognize each other. After identifying one another, PRICE said, "Shit I was hollering at, you know, letting you know everything was love," and "I hit you earlier." Indeed, the day prior, at approximately 12:41 P.M., PRICE, utilizing PRICE Telephone #2, placed an outgoing call to Terry LNU which went unanswered. PRICE went on to say, "I aint heard from you in so long and what happened, me and brother was by the house today, once everything got alright I said let me let everybody know. I was going through the phone and I seen your number and I hit ya," and "and I mean this nice too." Terry LNU and PRICE then arranged to speak later and arrange a transaction.

47. During the aforementioned conversation, I believe that when PRICE said that he was, "letting you know everything was love," he was informing Terry LNU that the narcotics he had obtained from LABRY on the morning of September 12th was of high quality, a fact he later reiterated when he said, " and I mean this nice too." Further, I believe that when PRICE referred to "brother," he was referring to LABRY and "the house" in this context referred to "moms" house, which I believe to be a common family member of LABRY and PRICE. I believe that when PRICE stated that he met with "brother" "today," he was actually referring to the meeting with LABRY the day before, when he had first called Terry LNU, but the call was not answered. Therefore, this telephone call further corroborates my belief that PRICE obtained a quantity of narcotics from LABRY during that September 12, 2019 meeting.

*September 24, 2019 Transaction Involving PRICE, LABRY and MARTIN*

48.     Based on intercepted calls, I believe that PRICE arranged to receive another quantity of narcotics from LABRY on behalf of MARTIN on or about September 24, 2019.  As with the prior transaction, I believe that ROBERTSON served as a messaging conduit between PRICE and MARTIN pertaining to this transaction.

49.     On September 24, 2019, at approximately 4:54 P.M., ROBERTSON received an incoming call from MARTIN, utilizing MARTIN's Phone, which lasted approximately 1 minute and 44 seconds.  On that same evening, my team conducted surveillance of ROBERTSON's Residence, via the aforementioned pole camera. At approximately 5:18 P.M, a brown Chevy truck, bearing LA Tag Y179470, registered to Sean MARTIN, arrived at the Residence. MARTIN then exited the vehicle carrying a bag over his shoulder and entered ROBERTSON's Residence.

50.     Approximately 4 minutes after MARTIN arrived, at approximately 5:22 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, who said, "I need to see you brah," and "today." PRICE said, "Alright, I'll be right down." ROBERTSON's communication with PRICE was his next communication after his call with MARTIN.

51.     I believe that during the aforementioned call, ROBERTSON was conveying to PRICE that MARTIN was at ROBERTSON's Residence and that PRICE needed to come there to discuss narcotics related business in person.

52.     At approximately 5:37 P.M., PRICE arrived at ROBERTSON's Residence in his Infiniti sedan and went inside.  At approximately 5:45 P.M., MARTIN exited ROBERTSON's Residence with a bag over his shoulder and departed in his vehicle, followed by PRICE, approximately five minutes later.

53.     At approximately 6:06 P.M., PRICE, utilizing PRICE Telephone #1, placed another outgoing call to LABRY, utilizing LABRY's Phone, which went unanswered.  PRICE's call to LABRY was his first call on PRICE Telephone #1 or PRICE Telephone #2 after departing ROBERTSON's Residence.  Shortly thereafter, PRICE, utilizing PRICE Telephone #1, placed another outgoing call to LABRY, utilizing LABRY's Phone.  During that call, LABRY asked, "you alright?" and PRICE said, "yea, yea, yea." LABRY said, "call you later."

54.     At approximately 6:45 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, who said, "been alright?"  PRICE responded, "Yea," and LABRY said, "I was asking cause them boys came back in town."  PRICE replied, "Uh-huh." After discussing a car briefly, PRICE said, "He had called me ya know. I told him hold on, so I could talk to my podner, I was making sure you straight."  LABRY said, "The man hungry, I appreciate though." PRICE then said, "C'mon man, this me and you. Alright, I'll be around if you need me, call me," and LABRY said, "Alright, I'll fuck with you."

55.     During the aforementioned call, I believe that when LABRY said, "I was asking cause them boys came back in town," LABRY was conveying to PRICE that his narcotics supplier had delivered additional narcotics and that when LABRY asked, "been alright," he was referring to PRICE's narcotics related business. Further, when PRICE said, "He had called me ya know. I told him hold on, so I could talk to my podner, I was making sure you straight," he was referring to the call he had received from ROBERTSON, which I believe was on behalf of MARTIN, which led to PRICE meeting ROBERTSON and MARTIN at ROBERTSON's Residence.  During the aforementioned meeting, I believe that the bag MARTIN brought to and from the Residence contained drug proceeds.  As such, I believe PRICE was informing LABRY that he had told MARTIN to slow his efforts to obtain a quantity of narcotics from LABRY until PRICE ensured

that LABRY would be able to supply the agreed upon quantity. Moreover, I believe that LABRY's response, "The man hungry, I appreciate though" is a reference to his appreciation of MARTIN's eagerness to conduct their agreed upon transaction.

*Seizure of Drug Proceeds on November 1, 2019*

56.    On or about November 1, 2019, DEA intercepted a telephone call between MARTIN and a then-unidentified male, later identified as Marvin COLLINS ("COLLINS"). During that telephone call, MARTIN and COLLINS arranged to meet at the Home Depot located in New Orleans East. Later that day, agents observed MARTIN arrive at the Home Depot driven by an unidentified male. Agents observed MARTIN enter COLLINS's vehicle, where he remained for less than two minutes.

57.    Subsequently, agents conducted a vehicle stop of COLLINS's vehicle and searched the vehicle. Inside, agents seized approximately $15,000 of U.S. currency. Approximately $10,000 was in one bundle labeled "10" and the approximately remaining $5,000 was in a bundle labeled "5."

58.    COLLINS was provided with Miranda warnings and was questioned about the money. COLLINS stated, in sum and substance, that he was on the way downtown to pick up his wife, and initially denied making any stops on the way. COLLINS later said that he stopped at a grocery store. COLLINS's statement was inconsistent with the surveillance conducted on that day. After confronted with the fact that he was observed at Home Depot, COLLINS stated that he met with his cousin at that location, named John Williams, but was unable to provide many specific details regarding this individual. In any event, this statement was also inconsistent with the aforementioned surveillance.

59.     Based on my training and experience, as well as the investigation generally, I believe that MARTIN provided COLLINS with the aforementioned $15,000 as a payment for narcotics that COLLINS previously provided to MARTIN.

*MARTIN Obtained Heroin from the Target Residence on November 12, 2019*

60.     Intercepted telephone calls involving MARTIN revealed that on or about November 12, 2019, MARTIN utilized the Target Residence to store heroin that he subsequently provided to a customer.  For example, on November 12, 2019, at approximately 1:36 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to ESPRIT, utilizing ESPRIT's Phone, and said, "Where you at?"  ESPRIT replied, "I'm inside."  During this call, I believe ESPRIT informed MARTIN that he was at the Target Residence.

61.     Later that day, at approximately 2:07 P.M., MARTIN, utilizing MARTIN's Phone, had a conversation with a telephone assigned number (504) 357-8084 ("PERKINS's Phone"), utilized by Odell PERKINS.  Technical issues precluded agents from determining the direction of this call.  During this call, PERKINS said, "Right there off Esplanade, by big boy," and MARTIN said, "huh."  PERKINS responded, "By brother," to which MARTIN said, "Alright."

62.     I know, based on this investigation, that members of MARTIN's organization utilize 1330 Kerlerec St., New Orleans, LA ("1330 Kerlerec") as a meeting location.  Further, I know that 1330 Kerlerec is in close proximity to Esplanade Ave. and that "big boy," refers to Corey JULUKE, a coconspirator of MARTIN whom spends the majority of his day at 1330 Kerlerec. Via a pole camera showing the vicinity of 1330 Kerlerec, I observed MARTIN to be at 1330 Kerlerec St. at the time of the aforementioned call, a fact confirmed by geolocation data associated with MARTIN's Phone.  As such, I believe that PERKINS and MARTIN arranged to meet at 1330 Kerlerec St.

63.     At approximately 2:21 P.M., ESPRIT, utilizing ESPRIT's Phone placed an outgoing telephone call to MARTIN, utilizing MARTIN's Phone, during which ESPRIT said, "Where you at because I'm about to make a move?"  MARTIN said, "Where you going?" to which ESPRIT replied, "[unintelligible] about to come slide on me."  MARTIN said, "You sound like you're in the car already," and ESPRIT then clarified that he was watching YouTube.  MARTIN then said, "I was just waiting on [unintelligible] and I'm about to pull out," and ESPRIT asked, "are you by Unk?"  MARTIN replied that he was, and ESPRIT said he would be at that location in due time.

64.     During this call, I believe that when ESPRIT said that he was, "about to make a move" and that, "[unintelligible] about to slide on me," ESPRIT was informing MARTIN that he would be leaving the Target Residence shortly to deliver narcotics to an unknown person.  I know, based on my experience, that narcotics traffickers often use vague terms like, "make a move" to denote an impending narcotics transaction and "slide on me" to indicate that an individual was coming to meet with them.

65.     At approximately 2:24 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to PERKINS Phone, which was answered by an unidentified female ("UF-1").  MARTIN said, "Hey sis, he left yet?" UF-1 responded that "he" had departed and MARTIN said, "Alright." I believe that MARTIN placed this call to ascertain whether PERKINS had departed his residence to meet him at 1330 Kerlerec St. and learned that PERKINS had left his phone behind.

66.     At approximately 3:20 P.M., PERKINS was observed, via pole camera, arriving at 1330 Kerlerec St. on foot.  At approximately 3:24 P.M., MARTIN departed 1330 Kerlerec St., in his Chevy Truck.  I believe that at that time, MARTIN and PERKINS discussed, in person, the

impending drug transaction that was alluded to over the above-described intercepted telephone calls.

67.     At approximately 3:21 P.M., MARTIN received an incoming call from a telephone assigned number (504) 628-6609, utilized by an unknown female ("UF-2") who asked what MARTIN was doing. MARTIN replied, "I was waiting to holla at my little partner," and then he would be on his way to meet UF-2.  I know that "holla at" is common used by narcotics traffickers to indicate a narcotics transaction and that "partner" is used to refer to an individual's counterparty, who in this instance, is PERKINS.

68.     A review of surveillance footage from a camera facing the Target Residence and the rear entrance of the building revealed that ESPRIT and an additional male ("UM-1") departed the Target Residence at approximately 3:28 P.M.

69.     At approximately 3:34 P.M., MARTIN was observed, via surveillance camera, entering The Esplanade at City Park via its rear entrance and at which time he proceeded to enter the Target Residence by himself. Additionally, geolocation information associated with MARTIN's Phone indicated that it was in close proximity to the Target Residence.

70.     At approximately 3:44 P.M., MARTIN was observed, via surveillance camera, departing the Target Residence by himself and exiting though the rear entrance.

71.     Shortly thereafter, MARTIN's vehicle arrived back at 1330 Kerlerec St., at which time PERKINS got into its front passenger seat before it departed. My team conducted surveillance of MARTIN and PERKINS as they traveled near 2015 Magic St., New Orleans, LA, the last known address of PERKINS. My team was unable to see PERKINS depart MARTIN's vehicle but shortly thereafter observed MARTIN driving his vehicle alone.

72.     Based on the intercepted telephone calls described above, as well as my training and experience, I believe that MARTIN obtained a quantity of heroin from the Target Residence, which he then provided to PERKINS in MARTIN's vehicle in the vicinity of 1330 Kerelec St.

*MARTIN Obtained Heroin from the Target Residence on November 13, 2019*

73.     On November 13, 2019, at approximately 12:18 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to a telephone assigned number (504) 621-7577 ("JACKSON's Phone"), utilized by Gene JACKSON and said, "I'm on my way down, where you at with it?" JACKSON replied, "I am downtown." MARTIN went on to say, "Alright, what time is you going to be free?" and JACKSON replied, "I'm free right now, where you at?" MARTIN said, "At my moms," and JACKSON said, "alright, I'm about to pass that way."

74.     During the aforementioned call, I believe that that MARTIN and JACKSON made arrangements to meet imminently at "mom's" to conduct a narcotics transaction. I know, based on my training and experience, that it is common for narcotics traffickers to utilize vague terms such as "it" or "thing" to refer to narcotics and/or narcotics transactions.  Therefore, I believe that when MARTIN asked JACKSON "where you at with it?" he was asking whether JACKSON was prepared to purchase heroin from MARTIN.  Further, based on this investigation, I believe that "mom's refers to 919 N. Claiborne Ave., New Orleans, LA, which is a bar/louge named "Jackie's Touch of Class," utilized by members of the organization as a meeting location ("Jackie's").

75.     At approximately 12:20 P.M., my team located MARTIN's Chevy Truck parked near the rear entrance of The Esplanade at City Park.  At approximately 12:26 P.M. MARTIN exited the rear entrance and departed in his Chevy Truck. A review of surveillance camera footage revealed that during this time, MARTIN entered the Target Residence for a short time before he departed and was subsequently observed by my team.

76.     I believe that MARTIN told JACKSON that he was at "Mom's" when he was in fact at the Target Residence because narcotics traffickers are reluctant to reveal the location of their "stash spot," given the value of narcotics stored there and the inability to seek legal remedy should they be stolen.  As such, I believe that once MARTIN had determined JACKSON was ready to conduct their transaction, he traveled briefly to the Target Residence to obtain narcotics he would give to JACKSON, thus minimizing the time MARTIN would the narcotics on his person and in turn minimizing MARTIN's risk of being caught with them.

77.     Surveillance was conducted as MARTIN traveled to Jackie's and parked in its front parking area. A tan Dodge Truck, bearing LA Tag Y164538, was observed parked in front of said location on the street and upon MARTIN's arrival, an individual later identified as Gene JACKSON emerged from the driver's seat of the Dodge Truck and got into the passenger's seat MARTIN's Chevy Truck. The aforementioned Dodge Truck is registered to JACKSON.

78.     After meeting briefly in MARTIN's Chevy Truck, JACKSON departed in his Dodge Truck. I believe that during this meeting, MARTIN provided JACKSON with a quantity of heroin.

79.     My team conducted surveillance of JACKSON as he traveled to the Westbank of New Orleans, at which time they conducted a vehicle stop of JACKSON. JACKSON was detained and a search of his Dodge Truck was conducted, resulting in the seizure of approximately 58 grams of a substance which field tested positive for heroin.  JACKSON was provided with Miranda warnings and interviewed, although he stated that he had been downtown working and hadn't met with any individuals prior to the traffic stop.  JACKSON was unwilling to provide any further information and was released in furtherance of this investigation.  JACKSON's statement was

inconsistent with the aforementioned surveillance conducted of JACKSON meeting with MARTIN.

80.     Based on the above, as well as the investigation in general, I believe that MARTIN and ESPRIT utilize the Target Residence to store larger quantities of heroin, which they then sell in ounce-level quantities to customers in various locations in New Orleans.  Therefore, I believe there is probable cause to believe that additional quantities of heroin are likely to be found inside the Target Residence.

81.     In addition, based on my training and experience, I know that it is common for narcotics traffickers to store additional evidence and instrumentalities of drug trafficking in these "stash spots."  For instance, it is common for drug traffickers to store electronic devices, such as cellular telephones and computers, utilized in the trafficking of narcotics.   Similarly, drug traffickers commonly store materials utilized in the processing of narcotics, such as plastic bags, scales, presses, and other drug paraphernalia in such locations.   It is also common for drug traffickers to store narcotics records, such as drug ledgers, customer lists, lists of telephone numbers.  Finally, it is also common for drug traffickers to store drug proceeds in such "stash spots."  Therefore, I believe there is probable cause to believe that such evidence is likely to be found in the Target Residence.

*Request for Delayed Notice*

82.     As described above, this search warrant is sought in connection with an ongoing long-term investigation of MARTIN, ESPRIT, and their associates.  That investigation includes ongoing wiretapping, and my team may seek additional wiretapping orders in connection with this investigation in the future.  My team is also currently utilizing confidential sources and other investigative methods to continue to investigate this organization.  However, the existence of this

federal investigation is non-public, and I do not believe that MARTIN or his associates are aware of its existence.   I do not believe that MARTIN or his associates know the identity of the confidential sources.

83.     My team intends to execute this search warrant at a time when there are no occupants of the Target Residence, and intends to complete the search before ESPRIT or MARTIN return to the residence.  Although my team intends to seize any evidence from the Target Residence pursuant to this search warrant, I believe that notification that this search warrant was obtained by DEA and issued by this Court could potentially reveal the existence of the federal investigation. Consequently, were MARTIN or ESPRIT to learn that such investigation is ongoing, they may change their methods (including telephones and telephone numbers), which could negatively impact DEA's ability to conduct ongoing (and potentially future) wiretapping.  In addition, were MARTIN and ESPRIT to learn that the federal investigation were ongoing, they may begin to scrutinize DEA's confidential sources, which could potentially jeopardize their safety. Furthermore, were ESPRIT or MARTIN to learn that a federal investigation was ongoing, they may attempt to flee the jurisdiction, destroy or tamper with evidence, and intimidate potential witnesses.  Therefore, I respectfully submit that there is reasonable cause to believe that immediate notification to MARTIN and/or ESPRIT could have an adverse result listed in 18 U.S.C. § 2705.

84.     Consequently, pursuant to 18 U.S.C. § 3103a(b), I am requesting that this Honorable Court authorize the officer executing this warrant to delay notice to ESPRIT and MARTIN and any other resident of the Target Residence for a period of 30 days.  Pursuant to 18 U.S.C. § 3103a(c), the government may petition the Court for an extension of such delay period in the future.

## CONCLUSION

85.     Based on my training and experience, and the facts set forth in this affidavit, I believe there is probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, or fruit of these crimes further described in Attachment B.  I also believe there is reasonable cause to delay notification of this search warrant to ESPRIT and MARTIN and any other resident of the Target Residence for a period of 30 days.


_____

Special Agent Ryan Schumacher
Drug Enforcement Administration


Sworn to and subscribed before me
this  18 th  day of November, 2019,
at  4  p .m., New Orleans, Louisiana.


_____
HONORABLE JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to Be Searched*

*3443 Esplanade Avenue, Apartment #147, New Orleans, Louisiana*

The premises to be searched is located at 3443 Esplanade Avenue, Apartment #147, New Orleans, Louisiana.  The apartment is located within the Esplanade at City Park Apartment Complex, which is located at 3443 Esplanade Avenue, New Orleans, Louisiana.

The Target Residence is located on the first floor of the building near an exit leading to the rear parking lot of the complex. 3443 Esplanade Avenue, Apartment #147, New Orleans, Louisiana has a wood colored door with a clearly marked "147" to its left, as viewed from the exterior hallway.  The target premises includes Apartment 147, the hallway adjacent to Apartment 147, and the mailbox for Apartment 147.

## ATTACHMENT B

*Property to be Seized*

Any and all evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, including, but not limited to:

    a.  narcotics and/or other controlled substances, and paraphernalia or equipment used in the preparation, packaging, concealment, or distribution of controlled substances, including, but not limited to, vials, caps, envelopes, ziplock-style bags, dilutants, scales, and counter-surveillance equipment;

    b.  Records, documents, books, ledgers, notebooks, memoranda, notes, receipts, photographs, audio tapes, video tapes, or lists, relating to the purchase, sale, transfer, or distribution of controlled substances.

    c.  Electronic communication equipment, including, but not limited to, telephone bases and handsets, pagers, answering machines, digital answering machine recordings, cellular telephones, electronic organizers, and the contents thereof;

    d.  Computer hardware, peripherals, and software, including all contents therein;

    e.  Currency and currency equivalents, precious metals, jewelry and financial instruments;

    f.  Bank statements, other bank records, letters of credit, money orders, cashier's checks, passbooks, canceled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, federal and state income tax returns, computer and software records containing financial data and information related to the receipt and other

2

disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property; and,

g.  Indicia of ownership, occupancy or residence of the premises being searched, including utility and telephone bills, lease agreements, and mortgage records, loan documents, rent receipts, service, remodeling, and repair contracts, keys, mail, identification documents, address books, date books, calendars, personal papers, and video tapes and photographs of persons.